```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                        EASTERN DIVISION


Stacy Ann Decker,              :

        Plaintiff,             :

     v.                        :       Case No. 2:12-cv-0454

Commissioner of Social         :       JUDGE ALGENON L. MARBLEY
    Security,                          Magistrate Judge Kemp
                               :
        Defendant.
```

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, Stacy Ann Decker, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income. Those applications were filed on August 25, 2008, and alleged that plaintiff became disabled on July 1, 2008.

After initial administrative denials of her applications, plaintiff was given a videoconference hearing before an Administrative Law Judge on October 21, 2010. In a decision dated December 13, 2010, the ALJ denied benefits. That became the Commissioner's final decision on March 28, 2012, when the Appeals Council denied review.

After plaintiff filed this case, the Commissioner filed the administrative record on August 20, 2012. Plaintiff filed her statement of specific errors on September 24, 2012. The Commissioner filed a response on October 29, 2012. No reply brief has been filed, and the case is now ready to decide.

II. Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 38 years old at the time of the administrative hearing and who has a tenth grade education, with

a subsequent GED, testified as follows. Her testimony appears at pages 32-44 of the administrative record.

Plaintiff last worked in 2005 or 2006. She lost that job due to having a prior criminal charge for domestic violence. She believed she was disabled due to mental problems which caused her to have difficulty focusing and concentrating. She also experiences side effects from medication, does not sleep well, and has frequent panic attacks. At the time of the hearing, she was seeing a psychiatrist and going to counseling.

Plaintiff identified her current medications as Abilify, Trazodone, Klonopin, Synthyroid, Vistaril, Benzotropine, and Lexapro. They relieved some but not all of her symptoms. Side effects included tremors, insomnia, loss of concentration, dizziness, dry mouth, and nervousness. The dizziness lasts an hour or two after she takes her morning medications. The tremors are ongoing although she was taking medication to reduce their severity.

Plaintiff testified that her diagnosed illnesses cause anxiety, panic attacks, shortness of breath, loss of interest in life, and depression. She had such symptoms every day. She could also have panic attacks, each lasting for ten or twenty minutes, as often as four times per week. She had been hospitalized for psychological reasons six or seven years before, based on a suicide attempt.

In a normal day, plaintiff would get up, take medication, and either sit around her house or go to medical appointments. She shopped for groceries once a month accompanied by a family member. She could not read or concentrate on a television program. She believed that she would be anxious if she went grocery shopping by herself. She did not believe she could do even a job that required little exertion or contact with others due to her issues with concentration. The dizziness, tremors and

headaches would also affect her ability to work.

### III. The Medical Records

The medical records in this case are found beginning on page 223 of the administrative record. The pertinent records can be summarized as follows. The Court's focus will be on the records of plaintiff's psychological impairments because her statement of errors relies primarily on those impairments rather than plaintiff's physical limitations.

Records from Licking Memorial Family Practice show that plaintiff was seen for depression, among other things, at that office, and that as of September, 2008, she was reporting more feelings of anxiety during the day. Most of those notes, however, deal with various physical ailments. Records from Moundbuilders Guidance Center indicate treatment for psychological symptoms going back to 1997. In 1999, notes show diagnosis of major depression and alcohol dependence and a GAF of 45 to 50 (Tr. 289). She saw a counselor again in 2006, reporting depression due to separation from her husband, who had been jailed for domestic violence. By October of 2008 plaintiff stated she was "tired of struggling" and wanted a way to deal with her depression and anxiety. (Tr. 290). She had been taking medications for those conditions as prescribed by her family doctor.

Plaintiff underwent a consultative psychological exam on December 18, 2008. Dr. White, the examiner, reported that plaintiff said she did not socialize or help with household chores. She told him of a history of arrests but said she had no current issues with other people. She was taking Zyprexa and Lexapro. In addition to discussing how she lost her job as an STNA due to the background check, she told Dr. White she had been employed for a week as a store clerk but could not concentrate or focus on the job. She also had issues with supervisors and co-

workers. Plaintiff also described a history of manic episodes. She appeared anxious and reported low energy levels and a lack of interest in most things. Dr. White assigned her a GAF of 52 and diagnosed bipolar disorder. He thought that plaintiff had only a moderate impairment in her ability to deal with work stress and pressure, but no other impairments of work-related functions. (Tr. 297-303). A state agency reviewer, Dr. Lewin, found a number of moderate limitations, involving the ability to deal with complex instructions, to maintain regular attendance and to perform on schedule, to relate to others in the workplace or to respond appropriately to changes in the workplace, and, as Dr. White also found, to deal with stress and pressure of everyday work activity by completing a workday or work week without interruption from psychologically-based symptoms. Dr. Lewin thought that plaintiff could perform simple tasks and was best suited for employment "in a calm, consistent work setting" where she did not have to deal with quotas, strict time constraints, or frequent contact with co-workers or supervisors. (Tr. 306-23). That assessment was later affirmed, after a review of additional treatment notes, by Dr. Meyer, another state agency reviewer. (Tr. 516).

The record contains a number of notes written by plaintiff's counselors beginning in late 2008. Generally, they show that plaintiff was experiencing anxiety and feelings of worthlessness, and that her counselors were helping her with these issues as well as issues like housing and furnishings and obtaining medical care. At one point she was experiencing both high anxiety and a risk of decompensation. Plaintiff also questioned her medication regime and stated she did not feel mentally stable. The social workers also reported that plaintiff had some passive suicidal ideation and difficulty staying on task. (Tr. 326-42). When she was seen on February 23, 2009, however, her GAF was rated at 58

even though she reported an increase in panic attacks and some OCD tendencies.  (Tr. 351-55).  Notes preceding this assessment indicated some mood stabilization but also an incident of heavy drinking.  Plaintiff was also caring for her granddaughter during this time and looking for work as well as performing a community service obligation.  (Tr. 356-60).  A note from February 24, 2009 shows that plaintiff presented with a "full affect" and was cheerful, although she had some hallucinations.  During the next month her anxiety was mostly described as "moderate."  (Tr. 361-71).  A note from her family practitioner dated April 2, 2009 showed that her depression had improved.  (Tr. 374).

On April 9, 2009, plaintiff underwent a psychotherapy assessment with Dr. Layne.  She described a long history of depression and anxiety with crying spells, panic attacks, and passive suicidal ideation.  She also described some recent hallucinatory episodes as well as difficulty sleeping and low energy levels.  The assessment of her impairments included a mood disorder, rule out bipolar disorder and PTSD, and alcohol abuse in early remission.  Her GAF was rated at 55 to 60.  She was continued on outpatient therapy and advised to avoid street drugs and alcohol.  Medications were also prescribed or continued.  She was to follow up with psychological testing.  (Tr. 430-34).  At a follow-up visit, Dr. Layne rated her GAF at 60.  Plaintiff described her anxiety as being under better control.  The results of the psychological testing were invalid, however.  Dr. Layne changed her medications but his recommendations were otherwise the same.  (Tr. 597-98).  Her condition had worsened slightly by the next visit and Dr. Layne changed her medication at that visit and did so again at the next visit.  She was slightly improved by August and in October reported a decrease in anxiety.  At that time, her sleep and appetite were described as "fairly good." (Tr. 611).  Concurrent counseling notes show that plaintiff was

-5-

having relationship issues but was, for the most part, coping with her anxiety.

The remaining records consist of Dr. Layne's treatment notes up to October, 2010. The notes show that plaintiff experienced some added stress around the holidays and that although she was generally doing well she was edgy and anxious much of the time. She had begun weekly counseling with Mid-Ohio Psychological Services. Her mood was different from visit to visit and Dr. Layne rated her GAF at between 55 and 65 for this entire period. He also completed a form assessing plaintiff's mental capacity, and expressed the view that she was markedly impaired in a number of important areas, including being able to get along with others in a work setting and being able to concentrate and complete a normal workday and work week. (Tr. 711-13). On a different form, he expressed much the same information but included a few additional areas where he thought she had marked limitations. (Tr. 715).

### IV.  The Vocational Testimony

A vocational expert, Mr. Brown, also testified at the administrative hearing, appearing by telephone. His testimony begins at page 52 of the record. He characterized plaintiff's past work as a nurse assistant as medium and semi-skilled but performed by plaintiff at the very heavy level.

Mr. Brown was asked some questions about a hypothetical person who could perform a full range of medium work. The person could also perform only simple tasks in a low-stress environment involving only occasional decision-making and changes in the work setting and not involving strict production quotas. The person could also have only occasional contact with co-workers and supervisors. With those restrictions, that person could, in Mr. Brown's view, not do plaintiff's past work, but could perform certain unskilled jobs such as hand packager, cleaner, and

machine tender.  However, someone who would be off task for up to an hour per workday, or who had a marked impairment in the ability to complete a normal workday and work week without interruption from psychologically-based symptoms or to perform at a consistent pace without an unreasonable number and length of rest periods could not do even those jobs.

>    V.   The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 11 through 20 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff met the insured requirements for disability benefits through September 30, 2013.  Next, plaintiff had not engaged in substantial gainful activity from her alleged onset date of July 1, 2008 through the date of the decision.  As far as plaintiff's impairments are concerned, the ALJ found that plaintiff had severe impairments including depression, anxiety, panic disorder, and lumbago.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that plaintiff had the residual functional capacity to perform a range of medium work but could perform only simple tasks in a low-stress environment involving only occasional decision-making and changes in the work setting and not involving strict production quotas and with only occasional contact with co-workers and supervisors.  The ALJ found that, with these restrictions, plaintiff could not perform her past relevant work, but he could perform those jobs identified by the vocational expert, such as hand packager, cleaner and machine tender, and that significant numbers of such jobs existed in the

central Ohio and national economies.  Consequently, the ALJ concluded that plaintiff was not entitled to benefits.

VI.   Plaintiff's Statement of Specific Errors

In her statement of specific errors, plaintiff raises four issues.  She argues (1) that the ALJ gave too much weight to the opinion of a non-examining source; (2) that the ALJ posed improper hypothetical questions to the vocational expert and did not properly define critical terms; (3) that the vocational expert improperly appeared by telephone; and (4) that the jobs identified by the vocational expert do not exist in significant numbers.  The Court generally reviews the administrative decision of a Social Security ALJ under this legal standard:

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court

would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

The Court turns first to plaintiff's claim of a procedural error - allowing the vocational expert, Mr. Brown, to give his testimony by telephone. According to plaintiff, there are only two proper ways for testimony to be given at an administrative hearing: in person or via videoconference. Plaintiff asserts that the Commissioner's failure to follow the Commissioner's own regulations requires a remand, and cites to Ainsworth v. Astrue, 2010 WL 252143 (D.N.H. June 17, 2010) and 20 C.F.R. §§404.936(c) and 404.950 in support of her argument.

There has been a good deal of discussion of this issue in the case law. For example, Koutrakos v. Astrue, 2012 WL 1247263, 177 Soc.Sec.Rep.Serv. 244 (D. Conn. Apr. 13, 2012), thoroughly examines the applicable regulations - which do appear not to permit telephonic testimony of expert witnesses, a point not disputed by the Commissioner's memorandum in opposition - and concludes that, at least in a case where the claimant objects to the procedure, the violation of the regulations is not harmless error. That decision relies heavily on Edwards v. Astrue, 2011 WL 3490024 (D. Conn. Aug. 10, 2011), which traces the history of the three regulations at issue (including, in addition to the ones cited by plaintiff, 20 C.F.R. §404.938(b)) and notes that the use of telephonic testimony was specifically considered and rejected during the rule-making process due to the impact it would have on counsel's ability effectively to cross-examine the witness. Both Edwards and Ainsworth held that the claimant is entitled to advance notice that the expert will testify telephonically, and that if the claimant objects, the objection should be sustained. According to Edwards, if the Commissioner wishes to proceed differently, "the Social Security

Administration must create a rule through the approved notice-and-comment process." Edwards, 2011 WL 3490024, at *8.

Although these decisions demonstrate that in the District of Connecticut, the failure to provide notice to the claimant or to sustain an objection to telephonic testimony is always grounds for remand, that is not the universal rule.  In other districts, courts have held that "the plaintiff must demonstrate that harm or prejudice resulted from the error in order to remand." See Green v. Astrue, 2013 WL 636962 (D. Mass. Feb. 20, 2013), citing Goodwin v. Astrue, 2011 WL 1630282 (D.N.H. Apr. 29, 2011) and Tardiff v. Astrue, 2012 WL 777484 (D.N.H. March 7, 2012).  This is the usual harmless error standard which is applied in this Circuit to most regulatory violations which occur in social security disability cases.  See, e.g., Rabbers v. Comm'r, 582 F.3d 647, 661 (6th Cir. 2009)(finding no reversible error in the failure to follow regulations because the failure "did not prejudice [the claimant] on the merits").  A stricter standard applies to the failure to adhere to the "treating physician" rule's requirement that the ALJ articulate the reasons for giving less than controlling weight to the opinion of a treating source, see Wilson v. Comm'r, 378 F.3d 541 (6th Cir. 2004), but as Rabbers notes, "Wilson's circumscribed form of harmless error review has not been applied outside the context of the reasons-giving requirement of § 404.1527(d)(2)...." Id. at 656.

The Commissioner's argument in this case consists of pointing out to the Court that it is not bound to follow Ainsworth, that the failure to follow these regulations is not the equivalent of a due process violation, and that plaintiff stipulated to the procedure.  The first two arguments, while true, are not helpful in determining if a remand is required here, because they do not address the regulatory violation argument at all, nor do they explain why the Court should not consider either Ainsworth or out-of-circuit authority to be

-10-

persuasive.  As to the third argument, it is true that at the administrative hearing, counsel stipulated that Mr. Brown could testify.  However, it is not at all clear that the stipulation encompassed his doing so by telephone, as opposed to the usual stipulation that he was qualified to give testimony.  In fact, the latter is the more likely interpretation of the stipulation, given the fact that right before the ALJ asked for a stipulation, he asked Mr. Brown whether his resume correctly stated his professional qualifications.  (Tr. 44).  Although the Court cannot find that plaintiff's counsel stipulated or agreed to Mr. Brown's appearance by telephone, it is accurate that he did not specifically object to it.  From reviewing the record, however, it does not appear that plaintiff was given any advance notice of the fact that Mr. Brown would appear by phone; the information provided to plaintiff about the videoconference hearing states that the ALJ would be able to see plaintiff, any witnesses she might bring, and any other witnesses such as experts, by video, (Tr. 98), and the notice to Mr. Brown directed him to appear at 401 N. Front Street in Columbus for a vidoeconference hearing. (Tr. 165).  No one has offered an explanation for why that did not occur.

    Although the Commissioner has not presented any specific argument as to why the Court should not adopt plaintiff's position about the consequences of the Commissioner's violation of the regulations which relate to how witnesses must appear at a hearing, the Court is faced with several choices.  First, the Court might conclude that the failure to provide advance notice of the fact that the expert would appear telephonically effectively deprives a plaintiff of a meaningful opportunity to object to the procedure in advance; in other words, it is not likely that once a claimant and the attorney have taken the time to appear in person for a hearing, they will ask for a postponement because the VE is not (contrary to their

expectations) present in person or by videoconference. Following that argument to the conclusion reached by the Connecticut District Court, if the procedure is improper and the claimant either objects or is reasonably excused from objecting, remand is required. Alternatively, the Court could hold that if the claimant's attorney either fails to object to the process or fails to cross-examine the witness, no prejudice can be demonstrated, and the error is harmless. Even if there had been an objection, or the absence of one is excused by the circumstances of the case, the Court might also consider the substance of the expert's testimony and conclude that, absent some showing that the testimony would have been different in some material way had the expert appeared in person or by videoconference, the regulatory violation -even if objected to by the claimant - can be excused as harmless error. Lastly, the Court might chart another course, treating the procedural irregularity (if not waived) as presumptively prejudicial, but carving out a small number of cases where remand would not serve any useful purpose. For the reasons that follow, that is the approach the Court will adopt.

    The analysis must start with the proposition that "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures .... even where the internal procedures are possibly more rigorous than otherwise would be required." Morton v. Ruiz, 415 U.S. 199, 235 (1974) (citations omitted). Nevertheless, as the Court of Appeals said in Wilson, 378 F.3d at 547,

> The Supreme Court has recognized the distinction between regulations "intended primarily to confer important procedural benefits upon individuals" and regulations "adopted for the orderly transaction of business before [the agency]." Am. Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 538-39, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970) (internal quotation marks omitted).

The significance of this distinction is, according to Wilson, that rules of the latter type can be relaxed or modified by the agency or its officials so long as the result does not cause substantial prejudice to an individual who is the subject of agency action.  A violation of the former type of rule, however, cannot be so easily excused because the failure to follow the rule presumptively results in the deprivation of a substantial right.  See Wilson; see also Rabbers, 582 F.3d at 651.  That deprivation is, in essence, the "prejudice" which precludes the Court from characterizing the regulatory violation as harmless error.

Following this analytical path, the Court must first ask whether the violation of the regulations regarding appearance of witnesses "deprives the claimant of a substantial right."  "A procedural right must generally be understood as 'substantial' in the context of this statement when the regulation is intended to confer a procedural protection on the party invoking it." Wilson, 378 F.3d at 547.  In Rabbers, the Court of Appeals considered the following factors when analyzing whether the procedural rule at issue in that case (a rule mandating assessment of certain criteria (known as the "B" criteria) for mental impairments) conferred a substantial right on parties before the agency.  First, it asked whether the purpose and language of the regulation was to aid the SSA or to serve as a safeguard to the claimant.  Rabbers, 582 F.3d at 656.  Second, it asked whether the language of the regulation itself described benefits to the SSA from following the rule or described benefits to claimant.  Id.  Third, the Court of Appeals considered whether the procedural rule was intended to ensure that a claimant would understand the disposition of his or her case.  Last, the Rabbers court considered the difficulty of applying a harmless error analysis.  It found against the claimant on each of these issues, determining that the rule intended to and did confer benefits

-13-

only on the SSA and did not advance the claimant's understanding of the disposition of the case, and that it was much easier for a court to conduct a traditional harmless error analysis for a violation of that procedural rule than it would have been for a court considering the rule at issue in Wilson. Id.

In conducting this analysis, it is helpful to quote the exact language of the regulations at issue.  20 C.F.R. §404.950 states, in its pertinent subsections, the following:

> (a) The right to appear and present evidence. Any party to a hearing has a right to appear before the administrative law judge, either in person or, when the conditions in § 404.936(c) exist, by video teleconferencing, to present evidence and to state his or her position. A party may also make his or her appearance by means of a designated representative, who may make the appearance in person or by video teleconferencing.
>
> . . .
>
> (e) Witnesses at a hearing. Witnesses may appear at a hearing in person or, when the conditions in §404.936(c) exist, by video teleconferencing. They shall testify under oath or affirmation, unless the administrative law judge finds an important reason to excuse them from taking an oath or affirmation. The administrative law judge may ask the witnesses any questions material to the issues and shall allow the parties or their designated representatives to do so.

Following Wilson and Rabbers, the Court must determine what type of rights are conferred by these regulations, and identify upon whom are they conferred.

First, these regulations clearly create procedural protections for claimants and not for the SSA.  If the rule were intended only for the convenience of the agency or ALJs, it would not require personal or videoconference attendance of either claimants or witnesses; the fact that it does so is based on the

benefit to the claimant in having an agency adjudicator see the claimant face-to-face and in allowing the claimant to see the witnesses who testify and pose questions to them in the most effective manner possible.  This interpretation is further supported by the language in 20 C.F.R. §404.938, which requires the agency to notify the claimant in advance if the hearing will be in person or by videoconference, and gives the claimant the ability to opt out of a videoconference hearing in order to appear personally before an ALJ.  Taken together, these rules provide substantial protections for the claimant and are for his or her primary benefit, not the agency's or the ALJ's.

It is also helpful to examine the process by which the videoconference regulations were adopted.  This Court will not trace the full history of that process because it is described in great detail in Edwards v. Astrue, 2011 WL 3490024, *5-6 (D. Conn. Aug. 10, 2011).  Importantly, at one point the agency argued for both videoconference and telephonic hearings, citing reasons of administrative convenience, but that argument was rejected.  While opposition from the Association of Administrative Law Judges cited, in part, an adverse effect on the ALJs' ability to make judgments about credibility if hearings were held by telephone, those comments also pointed out the impact that such a procedure would have on the claimant's ability to cross-examine expert witnesses - exactly the same problem which occurred here.

It is not too far a stretch to conclude that the regulation also promotes the claimant's understanding of the disposition of the case.  It is easier for a claimant to understand and appreciate the testimony of an expert whom the plaintiff can see than one who appears only by telephone.  Having the expert available for an in-person or videoconference cross-examination also promotes the claimant's belief that he or she has been given a fair process.

The last factor identified by Rabbers is how difficult it is to apply traditional harmless error analysis to a violation of the regulation.  That factor also favors strict application of the rule against telephonic testimony.  The problem with applying traditional harmless error analysis - especially when the claimant has effectively been deprived of the chance to object in advance to the telephonic attendance of an expert - is that in most cases, it will be difficult if not impossible for the claimant to show specific prejudice to the claim on its merits. For example, in Green v. Astrue, supra, at *11, where a traditional harmless error analysis was applied, the court found dispositive the fact that "[t]here is nothing in the record that indicates that the lack of notice that the testimony would be telephonic rather than in person altered counsel's ability to prepare for the cross-examination or that the presentation of the VE's testimony via telephone prejudiced the plaintiff in any way."  One of the two cases Green relied on, Tardiff v. Astrue, supra, was a case where the claimant objected to the procedure but the court still found harmless error.  The Tardiff court also placed the burden on the claimant to show prejudice to the merits of the case, and found her arguments about the benefits of cross-examination and evaluation of the credibility of the expert witness wanting, stating that:

> In this case, Tardiff has not explained how Dr. Koocher's testimony by telephone impaired her case. It is not apparent that the ALJ should have seen Dr. Koocher in person to evaluate his credibility or demeanor. Tardiff also has not shown what benefit she would have had if Dr. Koocher had been able to observe her during the hearing.

Id. at *7.

If that analysis were accepted, the absence of regulatory authority for taking testimony by telephone would be rendered meaningless because the claimant would always have the chance to

conduct a telephonic cross-examination and would be hard-pressed to demonstrate that having the chance to see the witness - or giving the ALJ that same opportunity - affected the outcome of his or her particular case in some tangible way.  In other words, the use of an analysis which focuses on demonstrable prejudice on the merits would allow the Commissioner to flout the applicable regulations with impunity.  Although lawyers and courts have a clear and historically justified sense that the visual presence of a witness is an important factor in both cross-examination and in credibility determinations, showing how the absence of that procedure has affected any individual case is an almost impossible burden to meet.  Consequently, each of the Rabbers factors favor treating a violation of these regulations as presumptive grounds for remand, and only narrow exceptions should apply.

It is important to note that even when this stricter type of scrutiny is applied to regulatory violations, if the violation is truly *de minimis* the Court may still overlook it and proceed to an evaluation of the merits of the claim.  Wilson identified situations where the violation of §404.1527's articulation requirement would not result in remand; as, for example, where the treating source's opinion was "so patently deficient that the Commissioner could not possibly credit it" or when the goal of the regulation was met even if the Commissioner failed to follow it.  See Wilson, 378 F.3d at 547.  The Court of Appeals later stressed, in Blakley v. Comm'r, 581 F.3d 399, 409-10 (6th Cir. 2009), that this narrow exception should not lead a reviewing court back into the practice of determining if substantial evidence supported either the ALJ's weighing of the treating source opinions or the ultimate decision in the case.  Otherwise, the protections rendered by the regulation would be merely illusory.

Here, the Court can envision some situations where the goal

-17-

of the witness appearance regulation is met even though the Commissioner fails to follow it, or where a violation is so patently harmless that no purpose would be served by a remand. For example, the ALJ might reject the vocational expert's testimony in a way that favors the claimant, or might reach a decision which does not rely in any way on that testimony - for example, by finding that no non-exertional limitations actually exist and that disability is determined based on the application of the Medical-Vocational Guidelines.  A remand in these situations might truly be an exercise in futility because even if the vocational expert had not testified, the ALJ's decision would have been the same.  When that is not the case, however - and it is not the case here - the violation of the regulation is not harmless, and a remand is needed in order to insure that the claimant is afforded his or her regulatory rights and that the Commissioner has an appropriate incentive to follow the regulation in question rather than to honor it in the breach.

  Given this disposition, it would not be appropriate for the Court to engage in a substantial evidence analysis.  That should be reserved for any appeal in this case which follows an administrative proceeding held in compliance with the applicable regulations.

## VII.  Recommended Decision

  Based on the above discussion, it is recommended that the plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

## VIII.  Procedure on Objections

  If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).

A judge of this Court shall make a <u>de novo</u> determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

<u>/s/ Terence P. Kemp</u>
United States Magistrate Judge
